UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In the Matter of ALEX C CORP.,<br>as owner of the Tug ALEX C and<br>BAY STATE TOWING COMPANY, as<br>Operator of the Tug ALEX C, for<br>Exoneration from and Limitation<br>of Liability | )<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>NO. 00-12500-DPW |

-----------------------------------------------------------------

| | | |
|---|---|---|
| POSAVINA SHIPPING COMPANY, and<br>SOCIEDAD NAVIERA ULTRAGAS, LTD. | )<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | CIVIL ACTION<br>NO. 01-12186-DPW |
| ALEX C CORP. and BAY STATE<br>TOWING COMPANY, INC. | )<br>)<br>)<br>) | |
| Defendants. | ) | |

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>
November 1, 2010

This litigation[1] followed in the wake of a Boston Harbor oil

---

[1] Two open cases - *In the Matter of Alex C Corp.*, Civil Action No. 00-12500 and *Posavina Shipping Co. v. Alex C Corp.*, Civil Action No. 01-12186 - remain of the several separate cases comprising this litigation. Civil Action No. 00-12500, *In the Matter of Alex C Corp.* is an exoneration action brought by the Defendants pursuant to the Limitation of Shipowner's Liability Act of 1851 ("Limitation Act"), 46 App. U.S.C. § 181, *et seq.*, now 46 U.S.C. § 30503. After the Defendants conceded that the Limitation Act did not apply to the Plaintiffs' claims for removal costs and damages under the Oil Pollution Act of 1990 ("OPA"), I directed the claimants to file a separate action regarding their OPA claims; the plaintiffs remaining before me did so in the other pending case docketed as *Posavina Shipping Co. v. Alex C Corp,* Civil Action No. 01-12186. In Civil Action No. 01-12186, however, in addition to raising claims based on the OPA, the Plaintiffs also filed additional claims including breach of contract, unseaworthiness, negligence, and gross negligence. In a Memorandum and Order that I issued on January 30, 2003, I

-1-

spill that occurred when a tug boat allided[2] with the tanker vessel it was meant to be undocking from the Mobil/Tosco Terminal in East Boston.  After a non-jury trial and extended review of the evidentiary record, I make these findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## I. FINDINGS OF FACT

### A.    The Preparation for Undocking

On the morning of June 8, 2000, the M/T POSAVINA had discharged her cargo of aviation fuel and was moored at the Mobil/Tosco Terminal ("Terminal") located in Chelsea Creek.  She was scheduled to be undocked by Bay State Towing Company, Inc. ("Bay State"), which had arranged for three tugs to assist in the undocking procedure.  Captain Michael Duarte, Vice President of Operations for Bay State and the docking master, intended to use the tugs ALEX C, LITTLE JOE, and QUENAMES in the procedure.  At

---

dismissed those claims in that action, nevertheless observing "that recovery of the physical and economic damages [] alleged under those theories remains subject to [the] Limitation Act proceeding" in Civil Action No. 00-12500.  *See Seaboats, Inc. v. Alex C Corp.*, No. 01-12184, 2003 WL 203078, at *11-12 (D. Mass. Jan. 30, 2003).

[2] The term *allide* "is used only in a special context in reference to ships in admiralty law.  When two ships *allide*, one of them is stationary; ships *collide* when both are moving before impact."  BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 44 (2d ed. 1995).  Garner, who is also editor-in-chief of the current BLACK'S LAW DICTIONARY, has more recently observed that "[i]n modern practice, 'collision' is often used where 'allision' was once the preferred term."  BLACK'S LAW DICTIONARY 88 (9th ed. 2009).

the time, Bay State was the owner of the LITTLE JOE.  Bay State also operated the ALEX C, which was owned by Alex C Corp.  The QUENAMES was independently owned and operated.

In preparation for the undocking procedure, each captain was expected to skipper his own tug to the Terminal.  Christopher Deeley served as the captain of the ALEX C that morning and brought the ALEX C to the Terminal.  But the captain of the LITTLE JOE, Rick Farrell, was running late.  As a result, Duarte asked Conte Coluntino, the captain of the QUENAMES, to bring the LITTLE JOE to the Terminal while Coluntino's first mate, David Kane, skippered the QUENAMES.

Once the tugs were en route to the M/T POSAVINA, Duarte traveled to the Terminal by van.  He arrived at 08:20 and boarded the M/T POSAVINA along with harbor pilot Chris Hoyt and apprentice harbor pilot Michael Peddle.  The three tugs arrived shortly thereafter and were at the tanker around 08:25.  Duarte instructed Deeley to position the ALEX C by the port stern quarter of the M/T POSAVINA, while the LITTLE JOE was positioned along the sea wall further astern of the tanker.  Duarte expected the QUENAMES and the LITTLE JOE ultimately to work the bow of the M/T POSAVINA during undocking.

With the LITTLE JOE in position, Coluntino requested permission, which Duarte granted, to return to the QUENAMES, leaving Scott Van Pembrook the only person on board the LITTLE

-3-

JOE.  Van Pembrook was an unlicensed deckhand and engineer at the time.  Coluntino then maneuvered the QUENAMES around the ALEX C and positioned it on the port bow quarter of the M/T POSAVINA. Van Pembrook remained on the LITTLE JOE and waited for Farrell's arrival.

**B.   The Engine Testing of the M/T POSAVINA**

At 08:30, Jurijs Koolatko, the captain of the M/T POSAVINA, entered the wheelhouse.  He exchanged pleasantries with Duarte before contacting his chief engineer to commence preparations for engine testing.  Within several minutes, second officer Deniss Alisevs, who was stationed on the starboard stern quarter, informed Koolatko that the vessel's propeller was clear, and the chief engineer indicated that the engine was ready for testing. During this period, the ALEX C remained at the M/T POSAVINA's port stern quarter.  Coluntino then requested that Deeley put the tug into neutral so that the QUENAMES could pass astern without getting caught in the ALEX C's propeller wash.  Once the QUENAMES had safely passed and moved to the tanker's bow, Deeley engaged the ALEX C's engine in the ahead direction and pushed back up against the tanker.

After 08:32, Koolatko began mandatory engine testing for the M/T POSAVINA.  As required by law, before a vessel can "get underway on the navigable waters of the United States," its main propulsion machinery must be tested in both the ahead and astern directions.  33 C.F.R. § 164.25(a)(5).  The M/T POSAVINA's

Maneuver Log recorded the following times, which I find to be -
as more fully discussed below, *see* Note 4 and accompanying text -
one minute and 10 seconds before the times at which the events
recorded actually occurred, for the engine testing:

| Time | Action |
|------|--------|
| 08:33:16 | Koolatko transferred control of the engine from the bridge to the engine room.[3] |
| 08:33:32 | The engine propeller began rotating in the ahead direction. |
| 08:33:53 | The propeller returned to a dead stop. |
| 08:34:16 | The propeller began rotating in the astern direction. |
| 08:34:36 | The propeller returned to a dead stop. |
| 08:34:38 | Control of the engine was transferred from the engine room back to Koolatko in the pilot house. |
| 08:34:47 | Koolatko began testing the engine in the ahead direction.  At 08:34:55, the propeller began to turn in the ahead direction. |
| 08:35:15 | The propeller returned to a dead stop.  No further engine testing was conducted after this point. |

Thus, the M/T POSAVINA's engine was tested three times:
ahead, astern, and ahead again.  A total of 1 minute and 59
seconds elapsed from the time Koolatko transferred control from

---

[3] Koolatko made two unsuccessful attempts to test the engine
from the pilot house on the bridge before he transferred control
of the engine testing to the engine room.  The engineers later
discovered that they had forgotten to switch on the air blower
for the vessel's main engine cylinders.  Although this was
considered nothing serious, Koolatko conducted a second engine
test in the ahead direction, once control was switched back to
him in the pilot house, to ensure that the system was functioning
properly.

the bridge to the engine room to the time the propeller came to a
dead stop after the second ahead test.  Although the precise
times recorded in the Maneuver Log are disputed, neither party
contests the overall duration of time that occurred during the
engine testing.

The times recorded in the Maneuver Log were based on the
tanker's computer clock.  Recognizing that manual recording
corrections were periodically made by M/T POSAVINA personnel, the
experts for both parties agree that the Geamar 120 ISL system
computer clock utilized by the tanker experienced a steady loss
of reported time as compared to actual time.  The experts
disagree, however, on the clock's rate of loss.  The Plaintiffs'
expert, Walter Shivik, whose opinion I credit, concluded that the
clock lost .85 seconds per day resulting in a time differential
of 1 minute and 10 seconds on June 8, 2000.[4]  Thus, I find that

_____

[4] The experts were provided with data from the M/T
POSAVINA's logs spanning the year 2000.  From February 13, 2000
to September 25, 2000, there were five manual corrections to the
clock time.  During this period, there were also numerous gaps in
the computer printouts as well as unreadable printout sections
leading to missing data.  In evaluating the data, the Defendants'
expert, Charles Hatvany, relied on data from February 13, 2000 to
March 17, 2000, an interval where there was no missing data.
Based on this data, he concluded that the clock lost 2.85 seconds
per day creating a time lag of 3 minutes and 57 seconds on June
8, 2000.  As Shivik notes, however, Hatvany fails to account for
the significance of the manual time correction that occurred on
February 13, 2000.  Unlike the other four manual time corrections
made by M/T POSAVINA personnel, where the adjustment ranged from
50 seconds to 1 minute and 34 seconds, the time was adjusted by 5
hours, 8 minutes, and 15 seconds on February 13, 2000.  Shivik
explains in great detail the potential error introduced into the

the M/T POSAVINA's engine testing was concluded at 08:36:25, 1
minute and 10 seconds after the recorded time of 08:35:15 in the
Maneuver Log.

## C.    Problems with the LITTLE JOE

Around 08:35, Van Pembrook began experiencing problems on
the LITTLE JOE.  The tug was swinging to its port side, and while
Van Pembrook steered it back starboard, wash from the M/T
POSAVINA's second ahead engine test caused the tug to swing
starboard against the sea wall.[5]  Deeley noticed Van Pembrook was
experiencing problems, attempted to make contact with him, and
then requested and received permission from Duarte to provide
assistance to the LITTLE JOE.  Deeley told Van Pembrook to shut
down his engines after which the LITTLE JOE drifted into the
middle of Chelsea Creek.

## D.    Maneuvering of the ALEX C

Deeley then attempted to take the ALEX C to the LITTLE JOE.
He took the ALEX C out of gear, so the tug dropped back from the
side of the M/T POSAVINA.  He realized he would not be able to
make the necessary turn given the angle of the ALEX C and her

---

interval relied upon by Hatvany as well as the basis for the June
16, 2000 to August 14, 2000 interval that he used.  I am
persuaded by the analysis laid out by Shivik and consequently
adopt his opinion that the clock lagged actual local Boston time
by 1 minute and 10 seconds on June 8, 2000.

[5] I provide in Note 8 *infra* a summary of the evidence that
supports my finding the second ahead engine test caused the
LITTLE JOE to swing board.

limited distance from the tanker. Although he could have accomplished the turn by causing the ALEX C to go forward and backward several times, Deeley decided to push back up against the M/T POSAVINA and attempt the turn again at a different angle. He put the tug's engine back into the ahead direction with the intent of returning to his original position against the tanker. But as the ALEX C approached, she turned in the starboard direction and approached a location further aft of her original position against the M/T POSAVINA. Once Deeley realized his tug was moving too far starboard, he shifted the tug's gear to full astern. However, the engine required eight to ten seconds before it would engage in the new direction, and during this time, the tug impacted the hull of the M/T POSAVINA. The fender of the ALEX C made metal on metal contact with the tanker in the flared area of her hull, puncturing the M/T POSAVINA, and causing oil to spill into Chelsea Creek.

**E.    The Timing of the Puncture of the M/T POSAVINA by the ALEX C**

I find that the puncture occurred at approximately 08:39. Aleksandrs Jekimovs, the second engineer, heard the metal to metal contact between the ALEX C and the M/T POSAVINA from his location on the port stern quarter of the M/T POSAVINA, looked at his watch, and noted the time of 08:39. This observation is corroborated by the photograph taken by Koolatko, the M/T POSAVINA's rough log, and Deeley's testimony. After Koolatko

-8-

heard the contact, he went to the port side, saw the oil spill, and ran to his room to retrieve a digital camera.  Based on his estimate, he returned to the bridge and took a photo of the spill within one minute.  The time stamp recorded with the photograph was 08:39:54.[6]  Koolatko then told the chief mate to record the time of impact.  The note in the tanker's rough log as well as Deeley's testimony indicate the incident occurred at 08:40.

At the time of the incident, the M/T POSAVINA was docked at the Terminal with all of her mooring lines still secured. Because she was a properly moored stationary vessel, this incident should be characterized as an allision.[7]  Based on the evidence,[8] I find that the allision occurred after the completion

---

[6] The camera was newly purchased and Koolatko had calibrated the camera's time based on the M/T POSAVINA's ship clock, which was different from the computer clock that recorded the engine testing times in the Maneuver Log.

[7] *See* Note 2 *supra.*

[8] I note that only two people reported witnessing propeller wash from the M/T POSAVINA prior to the incident.  Both Duarte and Van Pembrook noticed the ahead propeller wash when Van Pembrook started having trouble keeping the LITTLE JOE positioned next to the sea wall.  Van Pembrook never saw the propeller change direction after he started experiencing the effects of the wash created by the ahead test.

The testimony of two M/T POSAVINA crew members provides further support for my finding that the second ahead test had already occurred prior to the ALEX C's attempt to provide assistance to the LITTLE JOE.  The second engineer, Aleksandrs Jekimovs, who was standing on the port stern side of the tanker at the time of the incident, noticed the propeller movement start several minutes before the incident.  The second officer Deniss Alisevs, who was standing on the starboard stern side, felt the

of the M/T POSAVINA's engine testing.[9]

**F.    The Effect of the Engine Testing of the M/T POSAVINA**

Because the LITTLE JOE did not begin to experience problems until the second ahead test and the maneuvering of the ALEX C did not occur until thereafter, I find any effect from the engine testing of the M/T POSAVINA on the ALEX C's maneuvering could only have occurred during the second ahead test.  In his report, the Plaintiffs' expert witness, John Koopman, observed that during an ahead test, the area upstream of the propeller remains calm.  Based on the wash tests conducted by the experts, Koopman concluded that "[t]he ahead testing of POSAVINA's propeller has little effect on the currents upstream of the propeller plane."

_____

propeller move and saw water come out from under the stern of the tanker approximately five to seven minutes prior to the incident.

I note Deeley was the only witness who claimed he saw propeller wash shortly after the time of impact.  He stated he saw propeller wash from the M/T POSAVINA in the ahead direction after the incident when the ALEX C was backing away from the tanker.  But the ALEX C was generating its own wash in the astern direction as it backed up.  Since the area where Deeley saw the wash was covered by oil from the spill, I find it likely that the wash Deeley saw was actually generated by the ALEX C as it traveled in the astern direction.  In any event, I do not credit his contention that he saw propeller wash from the M/T POSAVINA after the ALEX C was backing away from the M/T POSAVINA following the impact.

[9] As a consequence, the opinion of the Defendants' expert witness, Milgram, which is based on the premise that the M/T POSAVINA's engine was being tested in the astern direction at the time Deeley attempted to maneuver the ALEX C over to the LITTLE JOE, is without force.  Milgram conceded that if the delay in the clock time as hypothesized by Hatvany was not correct, his theory of how the accident occurred would be "inaccurate."

I credit Koopman's opinion that the M/T POSAVINA's engine testing had no material effect on the ALEX C's maneuvering.  Rather, I find that Deeley did not exercise due care when he was navigating his tug to go to the assistance of the LITTLE JOE.

**G.   The Effect of the ALEX C Fender System**

The ALEX C had a fender installed on its bow to protect it from metal on metal contact.  The bow fender consisted of two large tires and a series of metal rods and plates.  Steel plates welded to the tug's hull supported the tires while shackles were used to attach the fender to padeyes that were welded onto the hull.  In addition, a string of rubber circles or "donuts" was placed on top of the tires to provide protection to the stem.

Prior to June 8, 2000, one of the padeye shackles broke and the fender system drooped downward leaving at least six inches of the ALEX C's stem including the padeye exposed.  Deeley informed Bay State's owner, Russell Tripp, Sr., of the damage but it was not fixed prior to June 8, 2000.

The Plaintiffs' expert witness, George Reid, agreed that the fender system was satisfactory for purposes of operation in the area where the ALEX C was supposed to remain.  It is undisputed, however, that the design of the fender system did not prevent metal on metal contact under the flared portion of the M/T POSAVINA.  I find that it was reasonably foreseeable that the exigencies of operations could bring the ALEX C's fender system

to locations - such as the flared area of the M/T Posavina's hull
- other than where intended for satisfactory operations.  I find
the configuration of the fender system was a substantial
contributing cause of the puncture of the hull of the M/T
Posavina and the resulting oil spill.

## H.   The Roles of Certain Bay State Personnel

### 1. Michael Duarte

On the morning of June 8, 2000, Duarte wore two hats: one as
an employee of Bay State with the title of Vice President of
Operations and one as an independent docking master.  As Bay
State's Vice President of Operations, Duarte attempted to find
business for the company, assigned tugs to certain jobs, and
assigned crew members to particular tugs.  As an independent
docking master, Duarte was in charge of the undocking process for
the M/T POSAVINA.  This independent role is recognized by the
inclusion of a pilotage clause in Bay State's tug service
agreements and promotional information.[10]

It is possible to distinguish the separate roles Duarte was
performing at the time particular orders were given.  Although
Duarte had already boarded the M/T POSAVINA at the time he gave

---

[10] Although the June 8, 2000 Bay State receipt for tug
service, which included a pilotage clause, was never signed by
Koolatko, previous receipts, which all included an identical
pilotage clause, bear his signature.  In addition, the evidence
is clear that the parties were proceeding on the understanding
reflected on such receipts.

Coluntino permission to leave the LITTLE JOE, I find this was a personnel decision and not one that involved tug maneuvering.  It was as Bay State's Vice President of Operations that Duarte had requested that Coluntino bring the LITTLE JOE to the Terminal.  I find that Duarte's correlative decision to allow Van Pembrook to man the LITTLE JOE on his own, while awaiting the arrival of Farrell, was similarly one that he made as Bay State's Vice President of Operations.  In addition, I find Duarte's decision to allow Van Pembrook to man the LITTLE JOE alone was a substantial contributing cause of the puncture of the M/T POSAVINA and the resulting oil spill.

I note, however, that when the LITTLE JOE encountered problems, and Deeley requested permission to help Van Pembrook, Duarte's role was fundamentally different.  The ALEX C was already pushed up against the M/T POSAVINA and the decision to provide assistance to the LITTLE JOE involved maneuvering the ALEX C in the vicinity of the tanker's propeller.  Hence, Deeley needed the docking master's permission before he could engage in any maneuvers.  I find that Duarte was acting as an independent docking master when he granted the ALEX C permission to assist the LITTLE JOE.  The Plaintiffs have not brought any personal claim against Duarte in his capacity as independent docking master.  Consequently, I make no findings as to any negligence or causation on his part in that role.

2.   *Scott Van Pembrook*

At the time of the events at issue, Van Pembrook had yet to
receive his pilot license.  The United States Coast Guard did not
issue that license until October 25, 2000.  Bay State employed
him as a deckhand, and his duties did not include any piloting.
Prior to the allision, Van Pembrook demonstrated an inability to
operate the LITTLE JOE properly.  I credit Deeley's testimony
regarding a conversation he had with Van Pembrook after the
incident.  During this conversation, Van Pembrook indicated he
could not control the LITTLE JOE.  Although he heard the
instructions that Deeley gave him through their handheld radio
transceivers, he was unable to follow those instructions because
he was looking at the wrong angle indicator.  I find that Van
Pembrook was not competent to handle the LITTLE JOE on the
morning of June 8, 2000 and that his lack of competence in
handling the LITTLE JOE was a substantial contributing cause of
the puncture of the hull of the M/T POSAVINA and the resulting
oil spill.

3.   *Christopher Deeley*

Deeley had served as the master or captain of various
tugboats since 1991.  As a tugboat captain for Bay State, Deeley
was regularly assigned to the ALEX C.  He was aware of all of the
operational nuances of the tug including the fact that when he
shifted the ALEX C's clutch from the neutral position to the

ahead or reverse position, there would be a delay of
approximately 5 seconds before the engine engaged in that
particular direction.   Deeley also knew that the ALEX C took at
least ten seconds before the engine could shift from ahead to
reverse.   I find that Deeley's negligence was a substantial
contributory cause of the puncture of the hull of the M/T
POSAVINA and the resulting oil spill.

## I.  Damages

The parties have effectively stipulated to damages of
$6,304,808.16 resulting from the puncture of the hull of the M/T
POSAVINA.   The itemized damage amounts are $5,789,363.93 for oil
spill clean-up costs, $146,569.51 for the Plaintiffs' legal costs
and expenses related to the clean-up, $288,874.72 for damages
from the M/T POSAVINA's hull rupture and an $80,000.00 settlement
reflecting economic damages suffered by Seaboats, Inc. whose
vessel also suffered physical damage by oil contamination of its
structure.[11]

_____

[11] By stipulation dated October 20, 2010, the parties agree
that:

> As a direct and proximate cause of the puncture of the
> hull of M/T Posavina and resulting discharge of oil into
> Chelsea Creek, Seaboats, Inc. suffered a) physical damage
> in the form of fuel oil contamination of structures of
> vessels it owned and operated, the Tug CARL RAY and the
> Barge SAN JUAN, and b) economic damage in the form of
> detention, resulting in demonstrated lost profits and
> associated operational expenses, from the lost
> opportunity to make additional trips with cargo.  The
> Plaintiffs reasonably settled the Seaboats claim for the

## II. CONCLUSIONS OF LAW

This litigation requires me to assess the Defendants' liability as well as any limitations on such liability that I find. I will utilize a bifurcated analysis with respect to liability. *See generally, Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999). First, I determine "whether negligence or unseaworthiness caused the accident." *Id.* Finding in Subsection A that both the LITTLE JOE and the ALEX C were negligently operated and unseaworthy, I then evaluate whether Bay State and Alex C Corp., as shipowners, were "privy to, or had knowledge of" the negligence or unseaworthiness. *See id.* In Subsection B, I find that they had such privity and knowledge and accordingly conclude the Limitation of Shipowner's Liability Act of 1851 ("Limitation Act") is unavailable to them. I turn in Subsection C to the question of liability limitation under the Oil Pollution Act of 1990 ("OPA") or ("Act") for Bay State and Alex C Corp. Finally, I resolve questions of damage and the availability of pre-judgment interest in Subsection D.

---

amount of $80,000.00 on October 15, 2003.

Until filing this stipulation, the parties contested both the Seaboats economic damage claims and an additional $100,000.00 in damages for a payment to settle a claim by Third Products Tankers, Inc., Civil Action No. 03-11071-DPW. The Third Products claim was solely for economic damages unaccompanied by any physical damage to the Third Products vessel URANUS. The Plaintiffs waived the Third Products claim by the October 20, 2010 stipulation.

A.    **Negligence and Unseaworthiness**

1.    *Negligence*

As noted in my findings of fact, I have concluded that the operation of the LITTLE JOE by Van Pembrook of the ALEX C by Deeley constituted negligence by the Defendants.

General maritime law follows the standard principles of negligence.  "To establish maritime negligence, a plaintiff must 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.'" *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991) (per curiam)(alteration in original).  The first three elements are readily opposed here, but the issue of causal connection requires further discussion.

Although the plaintiff is generally required to show the existence of a causal connection, case law has established that in a situation where the defendant is a moving vessel that collides[12] with a vessel at anchor, the burden of proof shifts to

_____

[12] *Collides* is the verb used in certain of the relevant cases; I believe the proper verb for the incident at issue in this case should be *allides* rather than *collides, see* Note 2 *supra.*  But irrespective of the lexicographical niceties of the label used to denote the event, the legal principle remains the same: When a moving vessel strikes a fixed object, a presumption of fault attaches to the moving vessel.

the defendant.  *The Oregon*, 158 U.S. 186, 197 (1895); *City of
Boston v. S.S. Texaco Tex.*, 773 F.2d 1396, 1398 (1st Cir. 1985)
("The rule is well settled that when a vessel under its own power
collides with an anchored vessel . . . , the burden of proving
absence of fault . . . rests on the pilot vessel.").  A
presumption of fault thus arises against the defendant moving
vessel.  *The Clarita and The Clara*, 90 U.S. 1, 14 (1874); *see
Merrill Trust Co. v. Bradford*, 507 F.2d 467, 470 (1st Cir. 1974)
("[B]ased upon the premise that such a striking would not occur
in the ordinary course, it warrants the inference that someone on
board the [moving] ship was negligent.").

        The Defendants' assertions that the *Oregon* presumption does
not apply to them are without merit.  First, they argue that the
M/T POSAVINA was a participant in the management of the ALEX C
because Koolatko had authority over the docking master with
regard to undocking procedures.  As I have found, however, the
M/T POSAVINA was not yet being undocked.  She was properly moored
and stationary at the time of the allision.  The only
communication with the tugs was through Duarte, and he did not
have an opportunity to discuss the undocking procedure with
Koolatko prior to the allision.  Thus, the M/T POSAVINA was not a
participant in the management of the ALEX C.[13]

_____

    [13] The Defendants' reliance on *Merrill Trust Co. v.
Bradford*, 507 F.2d 467 (1st Cir. 1974), is consequently
misplaced.  In *Merrill Trust*, the plaintiffs and defendants were

-18-

Next, the Defendants argue that the presumption of fault does not apply to them since the Plaintiffs violated a statute by failing to station an adequate lookout in the stern quarter of the M/T POSAVINA. *See Alamo Barge Lines, Inc. v. Rim Mar. Co., Ltd.*, 596 F. Supp. 1026, 1033 (E.D. La. 1984) (holding that a vessel anchored in violation of the law could not avail herself of the presumption of negligence that arises when a moving vessel strikes an anchored vessel); *Gaspar v. U.S.*, 460 F. Supp. 656, 659 (D. Mass. 1978) (same). Pursuant to Rule 5 of the Inland Navigational Rules, "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 U.S.C. § 2005.

If the M/T POSAVINA violated Rule 5, a statutory provision intended to minimize maritime collisions, she would likely trigger the *Pennsylvania* Rule, which would place the burden on

---

all located on the same vessel that capsized. It is unclear from the reported decision which one of the parties on the vessel acted negligently. The First Circuit noted that the *Oregon* presumption only applied to legal responsibility among the vessel and third parties and not to factual responsibility between the vessel's members. *Merrill Trust*, 507 F.2d at 470-71. Unlike the circumstances in *Merrill Trust*, the M/T POSAVINA was not a member of the ALEX C. In the present litigation, the ALEX C arrived at the M/T POSAVINA prior to Koolatko's arrival on the bridge. Duarte had not yet commenced the undocking procedures nor had he informed Koolatko of the ALEX C's maneuvering. Given the facts, I find that the M/T POSAVINA was not a participant in the management of the ALEX C at the time of the allision.

the Plaintiffs to prove that the M/T POSAVINA's violation could not have been a cause of the accident.[14]  *Grosse Ile Bridge Co. v. Am. Steamship* Co., 302 F.3d 616, 622 (6th Cir. 2002); *Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 826 (9th Cir. 1988); *United Overseas Exp. Lines, Inc. v. Medluck Compania Maviera*, *S.A.*, 785 F.2d 1320, 1325 (5th Cir. 1986); *see also The Pennsylvania*, 86 U.S. 125, 136 (1873).  Defendant's argument stumbles at the threshold; I conclude the M/T POSAVINA did not violate Rule 5 because Rule 5 is inapplicable.  Rule 5 is located within Part B of the Inland Navigational Rules, which is the section on Steering and Sailing Rules.  The M/T POSAVINA, however, was not steering or sailing at the time of the allision. Instead, she remained moored at the Terminal having just completed her mandatory propulsion testing pursuant to 33 C.F.R. § 164.25(a)(5).

---

[14] I note that the Plaintiffs for their part argue that the *Pennsylvania* Rule was triggered against the Defendants by the Defendants' violation of Rule 2, which states that "[n]othing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences . . . of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."  33 U.S.C. § 2002(a).  If the *Pennsylvania* Rule was triggered by this "good seamanship" requirement, however, it would apply in almost every maritime case.  Rule 2 does not encompass a statutory rule; rather, it simply indicates that the Inland Navigational Rules are intended to be applied along side existing maritime customs and practices.  Thus, I reject the Plaintiffs' argument that a violation of Rule 2 somehow separately triggered the *Pennsylvania* Rule against the Defendants.  In any event, the *Oregon* Rule provides the burden allocation the Plaintiffs seek through this argument.

The cases relied upon by the Defendants are consequently distinguishable.  Most of the cases they cite involved lookouts on moving vessels.  *See The Ariadne*, 80 U.S. 475 (1871); *The Senator D. C. Chase*, 108 F. 110 (2d Cir. 1901) (per curiam); *The Mary J. Kennedy*, 11 F.2d 169 (E.D.N.Y. 1924).  To be sure, the Defendants observed that Rule 5 has been extended in at least one case to cover anchored vessels.  *See Cliffs-Neddrill Turnkey International-Oranjestad v. M/T RICH DUKE*, 947 F.2d 83, 89 (3d Cir. 1991).  But the law has also long-recognized the fundamental difference between anchored vessels and vessels located in their berth.  *See The Granite State*, 70 U.S. 310, 313 (1865) (noting that a barge fastened to a pier, unlike a vessel anchored in a channel, was not required to have a light or maintain a lookout); *Dahlmer v. Bay State Dredging & Contracting Co.*, 26 F.2d 603, 605 (1st Cir. 1928) ("We cannot sustain the contention that a moored vessel is subject to the same rules, relating to lights, as those applying to an anchored vessel.  It is the doctrine of the court that no analogy can be drawn between anchored vessels and moored vessels in this connection.").  Since the M/T POSAVINA was properly moored in her berth at all relevant times, I conclude that the Rule 5 lookout requirement did not apply at the time of the allision.[15]

---

[15] Although I conclude that Rule 5 was inapplicable, I recognize that the M/T POSAVINA remains subject to "ordinary precautions of good seamanship, as defined by custom and case

Even assuming Rule 5 was applicable, I conclude that the tanker satisfied the letter and spirit of Rule 5 because the M/T POSAVINA had a lookout, Alisevs, the M/T POSAVINA's second officer located on the starboard stern quarter, who verified that nothing was obstructing the propeller prior to the commencement of engine testing.[16]

---

law". *United Overseas Exp. Lines, Inc. v. Medluck Compania Maviera*, 785 F.2d 1320, 1325 (5th Cir. 1986)(citation omitted). And in this connection, I note that on occasion, cases have found fault when a moored vessel did not provide a lookout on its stern quarter prior to commencing engine operations. *See The Nevada v. Quick*, 106 U.S. 154, 159 (1882) ("[I]n the midst of such a crowd of vessels as then filled the slip, since she did put her propeller in motion, she was bound to use the utmost caution and circumspection in order to avoid doing injury.  The least that could be expected of her was a constant lookout at every part.") Unlike *The Nevada*, the M/T POSAVINA did provide a stern lookout who checked the area around the propeller.  In addition, the propeller was being operated at a low speed as part of mandatory engine testing, rather than at higher speed as part of the undocking process.  Moreover, the attendant tugs, far from constituting a "crowd" of presumably unaware vessels, were in place to begin an undocking operation for which engine testing was a mandatory predicate.

[16] The Defendants also argue that the M/T POSAVINA's violation of its internal rules for the positioning of lookouts triggers the *Pennsylvania* Rule.  I need not decide this issue, however, because I find that the M/T POSAVINA did not violate its internal guidelines.  Pursuant to its Bridge Procedures Manual (Ex. 7):

> When the Bridge Team is active, a dedicated lookout that is adequately rested and fit shall be posted as follows: from sunset to sunrise; during the day, when visibility is restricted; when entering or leaving port; when the vessel is transiting through narrow waters; when there is heavy traffic density; when the vessel is responding to a distress call; on the poop when moving astern, if situation demands; and in any other circumstances as dictated by the Master.

Since the M/T POSAVINA did not violate any statutes that
could trigger the *Pennsylvania* Rule, the *Oregon* presumption of
fault applies to the Defendants.  In order to overcome their
presumption of fault, the Defendants "must show that . . . the
[M/T POSAVINA] was somehow at fault." *City of Boston v. SS
Texaco Tex.*, 599 F. Supp. 1132, 1138 (D. Mass. 1984), *aff'd*, 773
F.2d 1396 (1st Cir. 1985).  The Defendants argue that the M/T
POSAVINA was at fault when she acted negligently by: 1) failing
to post effective lookouts; 2) failing to report the presence of
the ALEX C to the Master; 3) failing to warn Duarte of the
impending engine testings; and 4) failing to take steps to avoid
impacting the navigation of the ALEX C.

The Defendants claim that these acts of alleged negligence
were superseding causes that severed any causal link between the
Defendants' negligence and the allision.  "The doctrine of
superseding cause is . . . applied where the defendant's
negligence in fact substantially contributed to the plaintiff's
injury, but the injury was actually brought about by a later
cause of independent origin that was not foreseeable." *Exxon
Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) (quoting 1

---

The allision occurred in the morning while the tanker remained
moored at her berth.  Undocking procedures had not commenced and
although the propeller was tested in the astern direction, the
tanker was not "moving astern."  I find that the M/T POSAVINA was
in compliance with the lookout requirements established in her
procedures manual.

T. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5-3, at 165-166 (2d ed. 1994)).

Even assuming M/T POSAVINA personnel acted negligently in their failure to do any one or all of these acts, a causal link between those omissions and the subsequent allision must exist in order for the M/T POSAVINA to be at fault.  As I have already discussed, the engine testing had no material effect on the ALEX C's maneuvering.  In addition, the failure to locate and report the position of the ALEX C and failure to alert Duarte of the engine testing were similarly not superseding causes of the damage inflicted on the M/T POSAVINA by the ALEX C.  Accordingly, even if these omissions were negligent, they could not have been the superseding or the proximate cause of the allision.[17]  The

---

[17] I note that a tug assisting a vessel in its undocking procedure owes the vessel a duty to avoid its propeller area. *See The City of New York*, 54 F. 181, 184 (2d Cir. 1893).

> The respective duties and obligation of a steamer docking under her own power and a tug engaged to assist in the operation have long been settled.  A tug engaged to assist a docking steamship is bound to know that the propeller of the vessel may be used frequently and without specific warning.  The tug must, accordingly, do that which is necessary to avoid coming in contact with the propeller.  The tug is engaged to perform a task which she holds herself out as being capable of performing.  When, through failure to take action to prevent coming into contact with a steamship's propeller, the tug strikes and damages it, the tug is liable.

*Grace Line v. The C. Hayward Meseck*, 150 F. Supp. 425, 429 (S.D.N.Y. 1957).

This rule, however, applies in the context of undocking

burden is on the Defendants to show that the M/T POSAVINA was at fault for the allision, and the Defendants have failed to meet this burden.

I find and conclude that negligent operation of the LITTLE JOE by the Defendant's agent Van Pembrook and the ALEX C by the Defendants' agent Deeley were causes of the allision between the ALEX C and the M/T POSAVINA.  I find and conclude that the Plaintiffs were neither negligent nor a cause of the allision.

   *2.   Unseaworthiness*

   a.   The ALEX C

I conclude that the damaged fender system made the ALEX C unseaworthy.  A seaworthy vessel is one that is "reasonably fit for its intended use." *Carr*, 191 F.3d at 3.  The focus is on whether "the vessel as equipped was reasonably capable of performing the intended mission if properly operated." *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 13 (5th Cir. 1976).  The evidence shows that the ALEX C fender system suffered damage

---

procedures rather than in a situation where the vessel remains moored in its berth.  To be sure, parallels can be drawn between the two scenarios.  Although the undocking procedure had yet to commence in the instant case, the M/T POSAVINA was required by statute to test her engine.  Indeed, such testing is reasonably foreseeable.  In Deeley's interview with the United States Coast Guard, he stated that vessels do test their engines without warning when the tugs are pressed up against the side.  Once a tug is pressed up against a vessel, there is always the chance the vessel will begin her engine testing.  Thus, even if the M/T POSAVINA's omissions somehow resulted in the allision, which I find they did not, the M/T POSAVINA did not necessarily owe a duty to the ALEX C to inform her specifically that engine testing was about to begin.

prior to June 8, 2000, and in the damaged condition it was unable
to perform its function of reasonably minimizing the damage
suffered by the M/T POSAVINA.  A seaworthy tug is one that is
"properly equipped and manned, and of sufficient capacity and
power to perform the task undertaken, *under conditions which are
to be reasonably anticipated.*"  *River Parishes Co., Inc. v. M/V
Flag Adrienne In Rem*, No. 01-0007, 2002 WL 1453826, at *5 (E.D.
La. Jul. 2, 2002) (citing ALEX L. PARKS, THE LAW OF TUG, TOW AND
PILOTAGE, 127 (3d ed. 1994))(emphasis added).  Although Deeley
presumably did not intend to operate the ALEX C under the flare
of the M/T POSAVINA, one could reasonably anticipate, given that
the tug operated near the flared portion of the tanker, that the
tug might enter this area.

Based on his familiarity with the fender system, Deeley
testified that, if the fender system had not been damaged, it
would have prevented metal to metal contact or at least reduced
the impact.  I find that the undamaged fender system would have
provided additional protection during impact.  Since it was
reasonably foreseeable that the ALEX C might enter the flared
area of the M/T POSAVINA, I find and conclude that the damaged
fender system on the ALEX C made the tug unseaworthy and was a
substantial contributing cause of the allision.

b.   The LITTLE JOE

I conclude that placing Van Pembrook, who was incapable of

-26-

operating the LITTLE JOE competently, in charge of the LITTLE JOE made this vessel unseaworthy.  "[T]o be inadequate[ly] or improperly manned is a classic case of an unseaworthy vessel." *Comeaux v. T.L. James & Co., Inc.*, 666 F.2d 294, 299 (5th Cir. 1982) (quoting *June T., Inc. v. King*, 290 F.2d 404, 407 (5th Cir. 1961)).  A vessel may be unseaworthy if she has an "[in]sufficient number of competent and skillful crewmen." *St. Paul Fire & Marine Ins. Co. v. Belle of Hot Springs, Inc.*, 844 F.2d 550, 553 (8th Cir. 1988).  Here, the decision was made to leave Van Pembrook on the tug by himself.  He was unlicensed, his duties did not include piloting any vessels, and he ultimately was unable to follow the instructions he received through his handheld radio transceiver.  Accordingly, I conclude as a matter of law that the inadequate crew on board the LITTLE JOE made the tug unseaworthy.

The unseaworthiness of the LITTLE JOE served as a substantial contributing cause of the allision.  If the LITTLE JOE had been properly manned and not in danger of grounding, Deeley would not have attempted to maneuver the ALEX C away from the M/T POSAVINA in an effort to go to the aid of the LITTLE JOE.

   3.  *Joint Several and Allocation of Liability*

The unseaworthiness and negligent operation of the LITTLE JOE and the unseaworthiness and negligent operation of the ALEX C are integrally linked and I find the Defendants jointly and

severally liable for the resulting harm.[18]

## B.   Privity and Knowledge

In order to be entitled to exoneration pursuant to the Limitation Act, the Defendants must establish that Bay State and Alex C Corp. lacked privity and knowledge regarding the negligent operation and unseaworthiness of the ALEX C.   *See Carr*, 191 F.3d at 4.   The Defendants bear the burden of establishing their lack of privity and knowledge by a fair preponderance of the evidence. *Id.*

When, as here, a corporation owns the vessel found to have been negligently operated or unseaworthy, "the test is whether culpable participation or neglect of duty can be attributed to an officer, managing agent, supervisor, or other high-level employee of the corporation."   *Id.*

### 1.   *Bay State*

As I have already discussed above in Subsection I.H.1 *supra*, I find that Duarte was acting in his role as Bay State's Vice

---

[18] The Plaintiffs also seek recovery through breach of contract and gross negligence claims.  I do not address the breach of contract claim because I find that claim duplicative. The gross negligence claim is apparently an attempt by the Plaintiffs to receive punitive damages.  But following the enactment of the OPA, which did not provide for punitive damages, the First Circuit concluded that "Congress intended the enactment of the OPA to supplant the existing general admiralty and maritime law, which allowed punitive damages under certain circumstances in the area of oil pollution."  *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65 (1st Cir. 2000).

President of Operations when he granted Coluntino's request to depart the LITTLE JOE and leave Van Pembrook in charge of the tug.  This decision to leave an unlicensed deck hand in charge of the LITTLE JOE was the direct cause of the tug's unseaworthiness and a substantial contributing cause to the puncture of the hull of M/T Posavina.  As a supervisor and high-level employee of Bay State, Duarte's actions in this regard are attributable to the corporation.  *See In re Great Lakes Transit Corp.*, 81 F.2d 441, 444 (6th Cir. 1936) (concluding that a shipowner was not entitled to liability limitation since the person the shipowner had left in charge of the vessel knew of the vessel's defect and this knowledge was imputed to the shipowner).  Thus, Bay State has failed to show that it lacked knowledge of the LITTLE JOE's unseaworthiness and cannot avail itself of the protections provided by the Limitation Act regarding the interaction between the LITTLE JOE and the ALEX C which gave rise to damages suffered by the Plaintiffs.  I take up Bay State's responsibility regarding the operation of the ALEX C in this next section.

        2.   *Alex C. Corp.*

    The Alex C Corp. is similarly not entitled to limitation of its liability unless it has shown that it lacked privity and knowledge regarding the negligent operation of the ALEX C. "[W]here an owner expressly delegates full authority to act for and in his behalf to an agent, he is bound by the acts of the

-29-

agent and will be held in privity by the knowledge of the agent." *The Trillora II*, 76 F. Supp. 50, 52 (E.D.S.C. 1947); *see also Cont'l Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1376 (5th Cir. 1983) (imputing the knowledge of a managerial agent acting in "the field of operations in which the negligence occurred" was imputed to the shipowner).  Based upon the evidence at trial, I find that the Alex C Corp. functioned as a shell corporation and existed solely to own the ALEX C, while day-to-day operations and maintenance of the tug were managed by Bay State.  Deeley was the agent of Alex C Corp. and also of Bay State; his knowledge of the ALEX C's unseaworthiness and his own negligence may be imputed to both corporations.  The Defendants did not present any evidence to the contrary and have failed to meet their burden of establishing lack of privity and knowledge.  Thus, the negligent operation of the ALEX C by Deeley, an employee of Bay State, and the unseaworthiness of the tug due to its damaged fender system, which was known by Bay State, are attributable to Alex C Corp., and neither Alex C Corp. nor Bay State are entitled to liability limitation regarding the ALEX C pursuant to the Limitation Act.

C.   **Limitation of Liability Pursuant to the OPA**[19]

Having concluded that the Defendants are not entitled to
exoneration from liability or protection pursuant to the
Limitation Act, I now address the issue of liability limitation
pursuant to the OPA.   In the Memorandum and Order that I issued
on January 30, 2003, in a related aspect of this litigation, *see*
*Seaboats v. Alex C Corp.*, Nos. 01-12184, 01-12186, 00-12509, 2003
WL 203078 (D. Mass. Jan. 30, 2003) ("2003 *Seaboats* Memorandum"),
I concluded that the Defendants' potential liability was not
subject to any limitation provided by the OPA.   *Id.* at *11.   The
Defendants filed a motion for reconsideration, and in response to
the invitation that I extended to the legal representative of the
Oil Spill Liability Trust Fund, the Department of Justice
submitted an amicus curiae brief on the applicable liability
limitation for third parties under the OPA.   I have reconsidered
below my 2003 *Seaboats* Memorandum in connection with these

---

[19] The Plaintiffs also seek damages pursuant to the
Massachusetts Oil and Hazardous Material Release Prevention and
Response Act ("Release Act").   MASS. GEN. LAWS ch. 21E.   The
Release Act defines a person liable for damages under the Act as
"any person who otherwise caused or is legally responsible for a
release . . . of oil or hazardous material from a vessel".   MASS.
GEN. LAWS ch. 21E § 5(a)(5).   Based on my discussion above, I find
that the Defendants fall within the definition of "persons
liable" as defined by the Release Act.   I am unable, however, to
find any evidence that confirms that the Plaintiffs followed the
notice requirements outlined in MASS. GEN. LAWS ch. 21E § 4A.
Without this evidence, I must find that the Plaintiffs are not
entitled to recover damages from the Defendants pursuant to the
Release Act.

Findings and Conclusions, but remain of the view that my earlier reading of the OPA in the 2003 *Seaboats* Memorandum generally reflects the correct interpretation of the statute.

   *1.  An Overview of the OPA*

   The OPA was designed to serve as "the primary federal legislation addressing oil spills into United States navigable waters and onto its shorelines." Steven R. Swanson, *The Oil Pollution Act of 1990 After Ten Years*, 32 J. MAR. L. & COM. 135, 135 (2001).  After the *Exxon Valdez* oil spill, Congress was concerned that oil spills were "still too much of an accepted cost of doing business for the oil shipping industry."  S. REP. No. 101-94, at 3 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 724. In response to this concern, Congress passed the OPA, which imposes strict liability upon "each responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters." 33 U.S.C. § 2702(a).  The Act lays out a comprehensive framework for assessing liability for removal costs and damages associated with an oil spill.

   In certain situations, the OPA causes a third party to be treated as a responsible party liable for removal costs and damages.  In § 2702, the Act offers a complete defense for certain responsible parties, if such an otherwise responsible party can establish that the spill was "caused solely by an act or omission of one or more third parties . . . , the third party

-32-

. . . shall be treated as the responsible party . . . for purposes of determining liability." 33 U.S.C. § 2702(d)(1)(A). But the Act narrows the third party defense by specifically excluding third parties that have a contractual relationship with the responsible party. 33 U.S.C. § 2703(a)(3). Once designated as a responsible party pursuant to § 2702, the non-contractual third party can limit its liability for an oil spill based on its vessel's gross tonnage. 33 U.S.C. § 2704(a).

The OPA provides contribution and subrogation rights to parties who have paid removal costs and damages resulting from a spill. A responsible party who has paid for these costs "may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law." 33 U.S.C. § 2709. Similarly, if the responsible party "pays compensation pursuant to this Act to any claimant for removal costs or damages [it] shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law." 33 U.S.C. § 2715.

   2.  *Section 2702(d) of the OPA*

In the 2003 *Seaboats* Memorandum, I concluded that the entirety of § 2702(d) is specifically limited to third parties who do not have a contractual relationship with the responsible party. Since the Defendants had a contractual relationship with the Plaintiffs for the undocking of the M/T POSAVINA, they are

not entitled to the limitation protection of § 2702(d)(2).  The
Defendants contend that the statutory text, legislative history,
and purpose of the OPA all support the conclusion that the
§ 2702(d)(2) third party liability limitation provision should be
applied to them.  I conclude, however, that those dimensions to
§ 2702(d) do not support the Defendants' contentions.

    a.   Text and Structure

    The Defendants argue that only § 2702(d)(1)(A) is limited to
non-contractual third parties since this subsection specifically
references § 2703(a), and none of the remaining subsections in
§ 2702(d) contain the same reference.  Section 2702(d)(1)(A)
provides:

> *Except as provided in subparagraph (B)*, in any case in
> which a responsible party establishes that a discharge or
> threat of a discharge and the resulting removal costs and
> damages were caused solely by an act or omission of one
> or more third parties *described in section 2703(a)(3)* of
> this title . . . , the third party or parties shall be
> treated as the responsible party or parties for purposes
> of determining liability under this subchapter.

33 U.S.C. § 2702(d)(1)(A) (emphasis added).  Section 2703(a)
provides:

> A responsible party is not liable for removal costs or
> damages under section 2702 of this title if the
> responsible party establishes, by a preponderance of
> evidence, that the discharge . . . of oil and the
> resulting damages or removal costs were caused solely by
> . . . (3) an act or omission of a third party, other than
> . . . *a third party whose act or omission occurs in
> connection with any contractual relationship with the
> responsible party* . . . .

33 U.S.C. § 2703(a) (emphasis added).  As I observed in the 2003

-34-

*Seaboats* Memorandum, the Defendants' argument that § 2702(d)(1) only applies to non-contractual third parties while § 2702(d)(2) applies to all third parties "turns the qualifier to subsection (A) on its head by treating subsection (A) as an exception to subsection (B). Subsection (A)'s language of '[e]xcept as provided in subparagraph (B)' clearly directs the reverse." *Seaboats*, 2003 WL 203078, at *6.

A review of the headings in § 2702(d), as a shorthand approach to understanding the structure of the statute, demonstrates that the Defendants' argument is flawed. Section 2702(d) is entitled "Liability of third parties." Subsection 2702(d)(1) is entitled "In general" and § 2702(d)(2) is entitled "Limitation applied." Subsection 2702(d)(1) lays out the general framework for a responsible party to "establish," *see* 33 U.S.C. § 2702(d)(1)(A), or "allege", *see* 33 U.S.C. § 2702(d)(1)(B), that the removal costs and damages were caused solely by an act or omission of a non-contractual third party. Subsection 2702(d)(2), the limitation subsection, follows the general framework laid out in § 2702(d)(1).

The subsections should not be viewed in isolation. The structure of § 2702(d) supports the interpretation that § 2702(d)(2), which is a specific limitation provision, qualifies § 2702(d)(1), a general provision that limits third party liability to non-contractual third parties. A review of the text and structure of § 2702(d) supports the conclusion that both

-35-

subsections 2702(d)(1) and 2702(d)(2) are limited to non-contractual third parties.

    b.   <u>Legislative History</u>

The OPA legislative history is consistent with my interpretation of § 2702(d).  In the Conference Report adopting the final version of the OPA, the Report states: "Subsection (d)(2) describes the liability of a third party under this section."  H.R. CONF. REP. 101-653, at 104, *reprinted in* 1990 U.S.C.C.A.N. 779, 782.  Just as the subsection titles clearly indicate a structure for the text, the legislative history illustrates that § 2702(d)(2) provides a considered exception to the third party liability outlined in § 2702(d)(1).

The Defendants reference an earlier proposed version of the OPA, which included the following language in § 2702(d)(2)(A): "If such third party or parties are the owner or operator of a vessel or facility which caused the incident . . . ."  The final enacted language states: "If the act or omission of a third party that causes an incident occurs in connection with a vessel or facility owned or operated by the third party . . . ."  The Defendants then place great emphasis on the deletion of the word "such."  But the final version of § 2702(d)(2)(A) reflects revisions to the text that involve much more than the deletion of the word "such" and appear designed to make the section clearer. The fact that the titles to the subsections remain unchanged

-36-

provides insight.  The title of § 2702(d)(2), "Limitation applied," remains unchanged and continues to tie the scope of the § 2702(d)(2)'s limitation provision to § 2702(d)(1), the provision that lays out the general structure for § 2702(d).

    c.   <u>Purpose</u>

The purpose of the OPA is to provide financial incentives to encourage oil spill prevention and speedy and effective oil clean-up when spills do occur.  The Senate Report indicates concerns over defendants "avoiding liability by claiming a third party was responsible, when that third party had a contractual relationship with the defendant and was acting, in essence, as an extension of the defendant."  S. REP. 101-94, at 12, *reprinted in* 1990 U.S.C.C.A.N. 722, 734.  The Report also emphasizes that third party defenses apply to a party "whose act or omission does not occur in connection with a contractual relationship with the defendant."  *Id.*

The Defendants argue that, by allowing contractual third party liability exposure for tugboats to be as great as the liability exposure of tanker vessels, the result would be a tugboat's inability itself to obtain insurance.  This argument, however, does not take into account, as recognized in the Senate Report, that although "an owner or operator may not transfer liability for any discharge or threat of a discharge, . . . agreements to insure, hold harmless, or indemnify are not barred."  *Id.*

3. *Liability for Contractual Third Parties*

The Department of Justice ("DOJ"), having agreed with my interpretation that § 2702(d) does not apply to contractual third parties, asserts in its *amicus curiae* brief that contractual third parties do not fall within the scope of the OPA at all. The DOJ argues that, because § 2702(d) does not apply, contractual third parties are not subject to any liability under the Act.  While this view is understandable from the government's perspective as a means to limit those whose conduct might deplete the Oil Spill Liability Trust Fund, I find such an interpretation of the OPA overly narrow and decline to adopt the DOJ's proposed reading of the statute.

Although § 2702(d) does not apply to contractual third parties, I conclude that § 2709 does.  Section 2709 states: "A person may bring a civil action for contribution *against any other person* who is liable or potentially liable under this Act or *another law*."  33 U.S.C. § 2709 (emphasis added).  Even if the OPA does not create its own liability provision for contractual third parties, it allows for the imposition of liability on these parties under "another law."[20]  Courts have concluded that third

---

[20] In addition, the OPA language states: "Nothing in this Act . . . shall . . . affect, or be construed or interpreted as preempting, the authority of any State . . . from imposing any additional liability or requirements with respect to - A) the discharge of oil . . . within such State; or B) any removal activities in connection with such discharge."  33 U.S.C. § 2718(a).  The OPA includes a savings provision, which states:

parties who do not fall within the purview of § 2702(d) can still be subject to an action brought pursuant to § 2709 of the OPA. *See Marathon Pipe Line Co. v. LaRoche Indus. Inc.*, 944 F. Supp. 476, 479 (E.D. La. 1996) ("Should the responsible party not be able to establish that a third party was the sole cause of the discharge, the OPA provides for an action in contribution."); *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atl. Corp.*, 924 F. Supp. 1436, 1446 n.4 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997)(TABLE) (concluding that a responsible party can seek contribution from a contractual third party pursuant to § 2709).  I share that view and conclude the Plaintiffs have a right to seek contribution through the OPA for oil spill removal costs and damages that the Defendants are liable for under other laws.

The DOJ asserts that the Defendants may seek liability limitation in accordance with the Limitation Act if the Defendants are liable for removal costs or damages resulting from the oil spill.  But the First Circuit concluded in *Metlife Capital Corp. v. M/V Emily S.*, that "claims arising under the OPA (for pollution removal costs and damages) are not subject to the substantive or procedural law of the Limitation Act."  *Metlife Capital Corp. v. M/V Emily S.*, 132 F.3d 818, 819 (1st Cir. 1997).

---

"Except as otherwise provided in this Act, this Act does not affect . . . admiralty and maritime law."  33 U.S.C. § 2751(e).

The DOJ suggests that the holding in *Metlife* was limited to responsible party liability, referencing language in the opinion referring to responsible parties: "[A] plain reading of [§ 2702(a)] suggests that the OPA repealed the Limitation Act with respect to removal cost and damages claims *against responsible parties*." *Id.* at 821 (emphasis added). Thus, the DOJ argues that the liability limitation protection of the Limitation Act is still applicable to claims against contractual third parties for oil spill removal costs and damages.

I conclude, however, based on the comprehensive framework laid out in the OPA, that Congress intended the OPA to address all claims regarding removal costs and expenses incurred in cleaning up oil spills. *See In Matter of Spray*, No. 95-3495, 1996 WL 451315, at *5 (D.N.J. Aug. 5, 1996) (concluding that the Limitation Act did not apply to claims relating to oil spills covered by the OPA); *see also In re S. Scrap Material Co., LLC*, 541 F.3d 584, 594 n.16 (1st Cir. 2008) (collecting cases where courts concluded that "later-enacted statutes impliedly repealed the Limitation Act for cases arising under those statutes."). When Congress enacted the OPA, it laid out a scheme for third party liability limitation but chose to exclude contractual third parties from these limitations. It also included a contribution provision allowing responsible parties to recover removal costs and damages from contractual third parties. The First Circuit

has observed that "the OPA embodies Congress's attempt to balance the various concerns at issue, and [we] trust that the resolution of these difficult policy questions is better suited to the political mechanisms of the legislature than to our deliberative process." *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 66 (1st Cir. 2000). Consequently, I conclude as a matter of law that the Limitation Act protections do not apply to contribution claims brought pursuant to § 2709 of the OPA.

I note further that, even if the Defendants could seek to limit their OPA liability pursuant to the Limitation Act, the result would be the same. As discussed above, *see* Subsection II.B., *supra*, the Defendants have failed to show that they lacked privity and knowledge of the negligent operation and unseaworthiness of the ALEX C. Thus, even if the Limitation Act applied to OPA damages, the Defendants would not be able to avail themselves of the Act's protections.

## D.  **Allocation of Damages and Imposition of Prejudgment Interest**

### 1.  *Allocation of Damages*

Two principles of allocation of damages under general maritime law are implicated in this case. The first is the rule of joint and several liability, which remains established law despite the 1978 adoption of principles of comparative fault. *See generally McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220-21 (1994); *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S.

256, 271-72 (1979); *Lyon v. Ranger III*, 858 F.2d 22, 26 (1st Cir. 1988).  The second is the rule of comparative negligence established by *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397 (1975).

These principles did not come into focus until I sought to bring the case to final judgment.  The Defendants resisted the imposition of joint and several liability.  I will nevertheless impose it.  The interaction of negligence by both Defendants and the unseaworthiness of the interacting vessels LITTLE JOE and ALEX C make this a case in which joint and several liability is appropriate.  *See generally, Joia v. Jo-Ja Serv. Corp.*, 817 F.2d 908, 914-18 (1st Cir. 1987).

While the Defendants have not in their pleadings directly raised the issue of their comparative negligence, they have requested that I nevertheless make findings and conclusions supporting a comparative allocation between them.  Because all the relevant evidence is before me in this case and there is no prejudice to either Defendant, I will do so in the interest of judicial economy.  Recognizing that comparative negligence allocation is a rough calculation, *see generally*, *Otal Invs., Ltd. v. M.V. Clary*, 494 F.3d 40, 63 (2d Cir. 2007), after considering both relative culpability and the relative causation of harm by the two vessels, I find and conclude that the operation of the ALEX C in its unseaworthy condition was 80%

responsible for the puncture of the M/T POSAVINA's hull and that
the operation of the LITTLE JOE in its unseaworthy condition was
20% responsible for the puncture of the M/T POSAVINA's hull.

   2.   *Prejudgment Interest*

   While the award of prejudgment interest is discretionary,
*see, e.g. City of Milwaukee v. Cement Div. Nat'l Gypsum Co.*, 515
U.S. 189, 195-96 (1995), *Clifford v. M/V Islander*, 846 F.2d 111,
113 (1st Cir. 1988), this long running case is an appropriate
occasion for such an award.  I have engaged in a dialogue with
counsel regarding the appropriate measure for prejudgment
interest since, unlike post judgment interest where 28 U.S.C. §
1961 provides the bench mark, there is no governing statutory
standard for prejudicial interest.

   Prejudgment interest is customarily conceived as the short
term time value of money; in this sense, it corresponds to the
compensation for the loss of funds until judgment enters and
execution on that judgment is available to a plaintiff.  This
case has not turned out to have been a short term enterprise and,
during the decade since the M/T POSAVINA spilled oil into Chelsea
Creek, short term interest rates have fluctuated dramatically.  I
have determined that the best means to account for such changes
is to employ a compounded variable average annual interest rate
based upon Treasury Bills, the classic form of short term risk
free investment instrument.  This methodology has been found not

-43-

unreasonable as an acceptable average for a prejudgment period.
*Pimentel v. Jacobsen Fishing Co., Inc.* 102 F.3d 638, 640 (1st
Cir. 1996).  By commencing interest at the several separate dates
on which payments were made by the Plaintiffs as responsible
parties for the consequences of the oil spill from the M/T
POSAVINA and compounding the actual loss of funds over an
extended time, the loss of funds pending judgment is adequately
recognized and compensated.  The parties have cooperated in
developing spread sheets to reflect the accumulation of the
prejudgment interest on the several separate sources of damages
and the dollar figure has been brought down to November 1, 2010
to coincide with the issuance of this Memorandum and Order.  This
leads to a prejudgment interest through November 1, 2010 of
$1,845,939.14.

### III. CONCLUSION

For the reasons set forth more fully above, I conclude that
the Defendants are liable for damages caused by the puncture of
the hull of the M/T POSAVINA.  I conclude that the Defendants are
not entitled to limitation of their liability pursuant to the
Limitation Act and that Plaintiffs may recover damages as
contribution from the Defendants under § 2709 of the OPA.
Accordingly, judgment shall enter for the Plaintiffs against the

Defendants jointly and severally awarding damages of

$6,304,808.16 and prejudgment interest of $1,845,939.14.



                                        _/s/ Douglas P. Woodlock_____
                                        DOUGLAS P. WOODLOCK
                                        UNITED STATES DISTRICT JUDGE